Myron S. EICHEN, Plaintiff,

v.

E. F. HUTTON & CO., INC., et al.,
Defendants.

Civ. No. 72–510–GT.

United States District Court,
S. D. California.

Sept. 2, 1975.

Jenkins & Perry, by Rex Heeseman, San Diego, Cal., for plaintiff.

Luce, Forward, Hamilton & Scripps, by Michael L. Kirby and Lee R. Rydalch, San Diego, Cal., for defendants.

## AMENDED MEMORANDUM OPINION AND JUDGMENT

GORDON THOMPSON, Jr., District Judge.

This action, commenced by plaintiff Myron S. Eichen on December 19, 1972, arises under the Securities Act of 1933, 15 U.S.C. § 77a *et seq.*, and the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.*, and specifically Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5. After lengthy discovery the parties filed a pretrial conference order on January 10, 1975. That document is particularly relevant to this discussion in that it incorporates 240 admissions of fact that required no proof at trial. Many of those admissions were of critical importance in reaching the conclusions of law found in this opinion. Other documentary evidence and oral testimony was offered during the course of the court trial. The testimony elicited at trial was often inconsistent and has caused this court to discount a number of plaintiff's contentions.

When considered in its entirety, the evidence indicates that plaintiff's causes of action are founded upon alleged misrepresentations which are said to have been material in inducing plaintiff to invest in a tax shelter program, defendant Texas International Drilling Fund–Series A (the "Fund"), offered by defendant Texas International Drilling Funds, Inc. ("Texas International"), a corporation and the general partner of the Fund.

Based upon the admissions of fact and proof at trial this court must conclude that plaintiff has failed to establish by a preponderance of the evidence that he is entitled to judgment in this case.

Initially, even a brief review of the facts of this case leads to the inescapable

conclusion that plaintiff is a very astute and sophisticated investor. It is acknowledged by all of the parties before the court that plaintiff's investment experience is substantial and that most of his profits in the securities markets have been made in high risk, speculative investments. By his own testimony, Mr. Eichen understood the term "risk" to mean the probability of losing all or some fraction of his investment. Further, he believed that every investment involved some risk and never believed any representations that he could not lose money on a particular investment.

While Mr. Eichen is most willing to admit that he is an experienced investor, he denies any knowledge of the operation of tax shelters. However, the evidence shows that Mr. Eichen formerly was an advisor to a mutual fund that specialized in tax shelter programs. This in itself suggests something more than complete unfamiliarity with sheltered investments.

Mr. Eichen's investments, despite frequent losses, often led to significant profits. His income, by 1967, was substantial enough to allow him to devote essentially all of his working hours to the management of his own investments. He presently lists his occupation as that of a venture capitalist.

In November of 1971, Mr. Eichen was advised by his personal accountant that his taxable income for that year could be between $500,000.00 and $1,000,000.00. Mr. Eichen, recognizing that he only had a few weeks within which to act, immediately began to investigate various types of sheltered investments. He talked to a number of accountants, attorneys, and personal friends and requested their suggestions. Generally, all of the individuals with whom he discussed shelters advised him of their potential for loss and warned him that at best all he could do was defer tax consequences for a limited period of time.

Ignoring the pessimism of his advisors, his research led him to the conclusion that he would invest in at least three shelters; his goal being to defer approximately two hundred thousand dollars of his 1971 income. These investments were to be made on a spectrum of risk with at least one of the three to be a very speculative tax shelter.

During the first week of December, 1971, plaintiff became aware of and invested in a real estate tax shelter program known as Century Properties Fund sponsored by Fox & Carskadon. His investment partner, John Stevens, had money in the program and strongly suggested that it was in conformance with Mr. Eichen's goals. Based primarily on the advice of his close friend and associate he invested $48,000.00 on December 6, 1971.

During this period of time, Stevens advised Mr. Thomas Carney, a registered account executive employed by E. F. Hutton & Co., that Mr. Eichen was interested in tax shelter investments. Mr. Carney had originally attempted to sell the defendants' program to Stevens but had not been successful. Carney contacted Eichen by telephone and discussed various investments. During their initial personal meeting Mr. Carney provided plaintiff with a prospectus and other documents for the defendants' tax shelter.

Defendant Texas International is a Delaware corporation engaged in the business of exploring and drilling for oil and gas. Defendant Fund is a limited partnership organized under the laws of Oklahoma, and is also engaged in the business of exploring for oil and gas. In January, 1970, the Fund established a six year program with the goal of raising $25,000,000.00 through the sale of registered public securities. Texas International, acting as general partner of the Fund, formed various limited partnerships and utilized the combined money to engage in a diversified oil and gas drilling program.

The initial limited partnership interests in the Fund were sold in 1970 pursuant to a registration statement filed with the Securities and Exchange Com-

mission. Four individual partnerships were formed in 1970. The available percentage of deductions for those partnerships varied between 94.99% and 100.-89%. The redemption value of those four programs, based on a $10,000.00 investment, fluctuated between $10,100.00 and $10,900.00.

Mr. Carney advised Mr. Eichen that, while this investment had attendant risks, he felt it was conservative in relation to other tax shelters; Carney testified that his conclusion was primarily based on the representations of Mr. Norman Stein, an employee of Texas International. He told Mr. Eichen that the past performance of the Fund was commendable and that the individuals employed by Texas International were of excellent quality. He stated that one of the prime safety factors utilized by the Fund was its diversification of capital over a broad range and number of drilling projects. He suggested that the maximum downside risk was 10 to 20%, that there would be 30 to 40 wells drilled with the partnership money, and that most of the money would be spent on semi-developed wells that drilled into "known pools of oil" in conjunction with major oil producers.

The supplemental prospectus which was provided to Mr. Eichen contains the following language in bold faced type on the cover page thereof:

> THESE SECURITIES ARE SPECULATIVE IN THAT OIL AND GAS EXPLORATION INVOLVES A HIGH DEGREE OF RISK.

That document provides a detailed description of the high risk factors involved in the program and explains the nature of diversified drilling.

Mr. Eichen admits that he did not do anything more than casually review the prospectus. His primary interest was the deductibility of the investment and he discussed this question with his accountant, Mr. Peterson, and with a tax attorney. Mr. Eichen remembers that Mr. Peterson was favorably impressed with the program in general. Mr. Peterson's recollection differs. Peterson recalls that he first advised Mr. Eichen that he lacked the expertise to make any recommendations. He added that he felt oil and gas programs involved high risks due to their technical nature which rendered them very difficult to evaluate. The tax attorney also refused to express an opinion on the merits of the program.

Following Mr. Carney's suggestion, Eichen contacted the regional director for E. F. Hutton & Co., Mr. Allan Crowne. Crowne confirmed the comments made by Carney and suggested that Eichen call Mr. Stein.

Mr. Stein was a vice president of Texas International specializing in marketing. He maintained offices in San Francisco to promote sales of partnership interests. The plaintiff and Mr. Stein discussed the Fund over the telephone and certain representations were allegedly made.

The evidence adduced at trial and in the admissions varies materially as to the nature of Mr. Stein's comments. Mr. Eichen testified that Stein not only represented that his maximum risk of loss or "downside exposure" would be ten to twenty percent but further suggested that he would personally guarantee the safety of the investment. At trial Mr. Stein testified that he never guaranteed anything and that his representations were based solely upon and confined to the content of the prospectus and the past earnings of the Fund.

In either case, shortly after talking to Stein, and three days prior to the deadline for investment in the program, on December 17, 1971, Mr. Eichen purchased $75,000.00 worth of partnership interests in the Fund's 1971 year-end drilling partnership.

As a condition to the purchase of the partnership interest Mr. Eichen was required to sign a suitability letter which again warned of the risks of the investment. In California, the Commissioner of Corporations imposes the highest suitability standards for oil and gas programs and pursuant to those requirements the letter made specific reference

to the uncertainty and speculative nature of the Fund.

Three days later Mr. Eichen invested in another real estate tax shelter, the Cascadian Apartments. This decision was motivated by the recommendation of another close friend, Dr. Ben Ichinosi.

Between the dates of December 6, and December 20, 1971, Eichen invested a total of $173,000.00 in tax shelters; by his own admission, those investments were made quickly because of the impending dire tax consequences facing him. On his personal income tax filing, Mr. Eichen reported losses of $178,379.00 for 1971 for his investments in various partnerships, including the three tax shelters. Mr. Eichen's $75,000.00 investment in the 1971 Texas International year-end drilling partnership permitted him to claim a partnership loss in excess of 100% of that amount, and resulted in tax savings of more than $45,000.00.

Mr. Eichen had no further contact with Texas International until the summer of 1972. At that time Mr. Carney again approached the plaintiff with respect to a possible investment in one of the Fund's 1972 tax shelter programs. The two individuals travelled together to the Fund's home office and were given a complete tour of the drilling operation. During the visit, the extent and nature of the investment of the funds of the partnership in which Mr. Eichen was associated was explained. He was advised that the program was not going well and that significant losses could reasonably be expected. He was further told that his partnership owned a significant portion of a gas well known as the Sarver Number One. The employees indicated that the eventual success of the program was tied to the outcome of this one well.

Following his tour, Mr. Eichen returned to San Diego and pursued no further action in respect to the Fund. In September, 1972, the Fund advised its investors that the Sarver Well had proven to be a dry hole. Mr. Eichen then consulted with counsel seeking advice on the proper course of action. In December of 1972 the instant action was filed.

In May, 1973, Texas International paid Mr. Eichen $3,600.00 as his redemption towards the $75,000.00 partnership purchase; a sum reflecting a loss of 95.2% of his initial investment.

In his original complaint, Eichen named as defendants E. F. Hutton & Co., Inc., its salesmen Carney and Crowne, the Fund, Texas International and Mr. Stein. Prior to trial a settlement was effectuated in respect to Hutton, Carney, Crowne and Stein and those defendants were dismissed.

The facts heretofore discussed lead the court to the following conclusions.

■ First, and perhaps a critical basis upon which this opinion is founded, the prospectus given to Eichen contains no material misstatements of fact. The prospectus repeatedly warns of the high risks associated with investment in an oil and gas drilling program. Had Mr. Eichen spent more time evaluating its content this action might never have been necessary. A complete review of that document leads to the inescapable conclusion that Section 12(2) of the 1933 Act, 15 U.S.C. § 77l(2) has not been violated.

■ Additionally, the evidence produced by plaintiff does not establish that Mr. Stein or any other employee of the Fund or Texas International made material misstatements of fact to Mr. Eichen. The evidence does show that many of the comments made by Mr. Carney do raise substantial questions of liability for violations of Section 17(a) of the 1933 Act, 15 U.S.C. § 77q(a), and Rule 10b–5, 17 C.F.R. § 240.10b–5. Generally, the testimony shows that Mr. Carney took certain liberties with the content of the prospectus and treated that document only as a requirement of the Securities and Exchange Commission. The court believes that Mr. Carney seized upon the information offered by the Fund in the prospectus and by Mr. Stein and because of his relative unfamiliarity with tax shelters offered explanations

that were inconsistent with the facts of any oil drilling program. There is a complete absence of proof that the Fund or Texas International were either aware of Mr. Carney's promotional activities or were in a position to ascertain the nature of his statements prior to the sale to Mr. Eichen. Given the relationship between the defendants (the Fund and Texas International) and the employees of E. F. Hutton, the court cannot find that said defendants controlled Hutton's employees or were responsible for their acts or misrepresentations. Accordingly, the court can find no liability premised upon Section 20 of the 1934 Act, 15 U.S. C. § 78t, and Section 15 of the 1933 Act, 15 U.S.C. § 77o. *See Strong v. France,* 474 F.2d 747, 752 (9th Cir. 1973); *Kamen & Co. v. Paul H. Aschkar & Company,* 382 F.2d 689 (9th Cir. 1967) *cert. dismissed,* 393 U.S. 801, 89 S.Ct. 40, 21 L.Ed.2d 85 (1968).

Due to the absence of any liability for the statements of the Hutton employees, any recovery by plaintiff must be based upon the actual statements of Mr. Stein made during his personal conversations with plaintiff or repeated by Carney and Crowne. Plaintiff's proof brings four statements into issue:

1. The assurances that this was a safe and conservative oil drilling program;

2. The representations that the assets of the Fund would be diversified through investment in both developmental and "wildcat" or exploratory wells and by spreading the funds over a large number of wells;

3. The explanation that developmental wells involved drilling, in conjunction with major producers, into "known pools of oil";

4. The alleged guarantee that the maximum "downside" risk would be 20%.

■ The evidence before the court does not show that Mr. Stein's comment, that the program was a conservative and safe oil drilling program, was false or a material misrepresentation of fact. The testimony of Mr. Carney establishes that Mr. Stein recognized that oil drilling programs were considerably more speculative than real estate and cattle feeding shelters. Mr. Stein's comments were confined solely to the representation that in comparison with other oil and gas drilling programs the Fund offered a more conservative investment. Given the content of the prospectus and Mr. Stein's testimony that his discussions with investors were based upon that document, the court cannot find these representations were false.

■ The representations of the Hutton employees and Stein and the sections of the prospectus that state that the funds would be diversified were true and accurate. Mr. Eichen was told that the Fund's year-end drilling partnership would participate in 30 to 40 wells. In fact money was invested in differing amounts in 32 wells. The parties did not contest the fact that more than 80% of the funds were invested in semi-proven or developmental wells; a policy in conformance with the prospectus. Plaintiff's counsel points to the fact that over one third of the funds of the partnership were invested in the Sarver Number One Well. This, counsel contends, clearly shows a material misrepresentation. This point would be far more important in the resolution of the case had the Fund or Texas International promised or obligated themselves in the prospectus or during their personal sales efforts to use the funds in a specific manner. Such is not the case; a review of the prospectus reflects that Texas International reserved the right to determine where the assets of the partnership would be invested. A clear risk of all oil programs is that frequently large expenditures of money will lead to unproductive wells. Such was the case with Sarver Number One. The evidence indicates that the defendants followed the general policy of diversification outlined in the prospectus.

■ The explanation or the use of terminology by Hutton's employees that the semi-proven or developmental wells involved drilling into "known pools of oil" would be more troublesome if plaintiff would have presented sufficient evidence to show that the concept originated with Mr. Stein. Such is not the case. There is no specific testimony or evidence that Mr. Stein ever offered this explanation as to the operation of the program. On the contrary Mr. Stein's own testimony is to the effect that his comments were based upon the contents of the prospectus which most adequately displace the myth of drilling into "known pools of oil." The concept of "pools" appears to have been created by the Hutton employees. This conclusion is supported by the testimony of Mr. Singer. Mr. Singer testified that he contacted Carney and was given an extremely optimistic picture of the Fund. When he contacted Stein the predictions were more guarded and were far less optimistic than those of Carney. In any event, in order to justify imposition of liability under the Rule the statement must be found to be material.

The appropriate test of materiality is essentially objective (see 2 Bromberg, Securities Law: Fraud § 8.3 at 201 (1973); " . . . whether 'a reasonable man would attach importance [to the fact misrepresented] in determining his choice of action in the transaction in question.'" *Marx v. Computer Sciences Corporation,* 507 F.2d 485, 489 (9th Cir. 1974); *List v. Fashion Park, Inc.,* 340 F.2d 457, 462 (2nd Cir. 1965).

Applying this standard to the representation of drilling into "pools of oil" the court finds that the statement was not material. This results from the patent unreasonableness of the statement itself. The prospectus, while obviously not fully explaining the technology of the program, adequately discusses the risk of the venture and the nature of semi-proven wells. Objectively, no reasonable person would rely on such a statement in light of the apparent speculative nature of oil drilling programs.

■ The alleged predictions of downside risk and attendant guarantees which Eichen imputes to Stein are more troublesome to the court. The evidence offered is insufficient to conclude that any guarantees were made by Mr. Stein to Mr. Eichen. However, the court does find that Mr. Stein did express an opinion on the ultimate risk associated with the investment. The law is established that a forecast, essentially a prediction, may be regarded as a "fact" within the meaning of 10b–5. *Marx v. Computer Sciences Corp., supra; G. & M. Inc. v. Newburn,* 488 F.2d 742 (9th Cir. 1973). Stein's prediction or expression of opinion was based on the content of the prospectus and on informational reports provided by the Fund. The Fund's performance during the year 1970 was excellent and had been quite successful. Stein's comments were based on the prior performance of the Fund and were founded upon a factual basis sufficient to distinguish this case from those cited above. The court must conclude that at the time Stein's opinion was expressed he neither knew that his comments were untrue nor had any reason to believe that they were based on false information. The thrust of Stein's comments was that the program was doing well and that Mr. Eichen could expect similar performance. "Under the securities law a reasoned and justified statement of opinion, one with a sound factual or historical basis, is not actionable." *G. & M. Inc. v. Newburn, supra,* at 745–46.

The court specifically finds that the statements of opinion made by Mr. Stein and rephrased and repeated through the Hutton employees were not of a character to give rise to liability under Rule 10b–5 or under Section 17(a) of the 1933 Act, 15 U.S.C. § 77q(a).

■ This conclusion is supported by the recent Ninth Circuit decision of *White v. Abrams,* 495 F.2d 724 (9th Cir. 1974). That opinion specifically rejects the concept of scienter or any

other discussion of defendant's state of mind as a necessary and separate element of a 10b–5 action, *Id.* at 734. In lieu thereof the court indicates that a flexible duty standard is more appropriate. In making the determination of a defendant's duty under the Rule the court suggested a number of tests or standards. However, the court specifically included an admonition that any attempt to compartmentalize or establish rigid tests should be rejected by the trier of the fact. For the reasons discussed below, in applying a flexible standard to the facts of this case, this court must conclude that defendants Texas International and the Fund satisfied their duties to the plaintiff.

Initially the court must note that Mr. Eichen's level of sophistication and investment experience is significant and is not compatible with his claims of reliance on the comments involved herein. His history as a professional investor demonstrates an uncanny ability to understand the nature of very complicated investments, he is not one who could easily be induced to make improvident expenditures of investment capital. Mr. Eichen admits that he had no feelings of trust or confidence in Hutton's employees or in Mr. Stein and that it was his practice to discount the advice of those who were not in his confidence. Further all of his personal advisors warned him of the high risk and speculative nature of the investment; one of whom went so far as to remind Eichen that he was basically dealing with salesmen and that he should not rely on their statements. The suitability letter and the prospectus further reinforce this court's conclusion that there is a total absence of subjective reliance. In the past and as a general rule Mr. Eichen's investments were the result of his own investigation and were never based on the representations of individuals with whom he had no existing relationship of trust and confidence.

■ Here Mr. Eichen, while not familiar with oil and gas programs *per se,* was a professional investor. He also had the benefit of complete disclosure based upon the dire warnings contained in the prospectus. The suitability letter required by the California Commission of Corporations was also adamant in indicating the risks involved herein. It is of little moment that Mr. Eichen now contends that he paid little if any attention to these documents. Where the evidence establishes that plaintiff has both sufficient experience to conduct his own investment affairs and has access to sufficient information to understand the nature of the investment, he has a duty of reasonable diligence which must be exercised to create a right to recover.

An investor who casually makes investments, and who blindly rides bubbles until they burst, does so at his own risk, and cannot later invoke § 10(b) as a form of "investor's insurance". *McGraw v. Matthaei,* 388 F. Supp. 84 (E.D.Mich.1972). Also *see Clement A. Evans & Co. v. McAlpine,* 434 F.2d 100 (5th Cir. 1970), *cert. denied,* 402 U.S. 988, 91 S.Ct. 1660, 29 L.Ed.2d 153 (1971).

The evidence in this case establishes that Mr. Eichen's investment in defendants' offering was primarily motivated by two factors. First, Mr. Eichen publicly indicated that he planned on making investments in at least three tax shelters, one of which would be of a speculative nature. Mr. Eichen's contention at trial that Texas International was more of a conservative investment than the two real estate programs is unsupported by the evidence and strains the court's imagination. The bulk of the evidence established that Texas International was Mr. Eichen's speculative investment.

Finally, the evidence is clear that Mr. Eichen acted in haste due to the possible year end tax consequences. He was most anxious to invest approximately $200,000.00 in shelters. The deadline for purchasing defendants' program was December 20, 1971. Mr. Eichen effectuated his purchase on December 17, 1971,

only three days prior to the deadline. Given Mr. Eichen's sophistication, one can only conclude that the desire to avoid taxes prompted Mr. Eichen to act in such haste as to have caused him to ignore the risks inherent in the investment.

Based upon the foregoing discussion of the law and facts, pursuant to Rule 52(a), Fed.R.Civ.P., the court must conclude that plaintiff Myron Eichen has failed to prove a right to recover for violation of the federal securities laws.

Accordingly,

It is the judgment of this Court that plaintiff take nothing by his action and that defendants Texas International Drilling Funds, Inc. and Texas International Drilling Fund–Series A recover their costs of suit.